NASH, C. J., dissented from the Court, on the question of arresting the judgment, believing that the substitution of blow, for wound, was a matter of substance, not cured by the Act of 1811.
The indictment charged the defendant with the murder of one John Davis, and was in the common form, with the two exceptions pointed out in the reasons given in arrest of judgment, and which need not be noticed here.
As all the material evidence in the case is interspersed in his Honor's statement of his charge to the jury, and as that statement was elaborately criticised at the bar, and is cautiously reviewed in the opinion of the Court, the Reporter deems it but just to give it entire, in the words of his Honor. It is as follows, viz: *Page 419 
"The Court charged the jury, that to sustain the indictment against the prisoner, it was for the State to show that a murder had been committed, the manner and time of doing it, and that the prisoner was the perpetrator of the crime: that being a case of circumstantial evidence, it was necessary for the State to establish every fact relied on as material to the prisoner's guilt, by testimony producing moral certainty in the minds of the jury, to the exclusion of every rational doubt, so as fully to satisfy their consciences. The jury were to decide as to what facts were established to their satisfaction: what were the just, fair, and legitimate inferences, and whether they produced in their minds, the necessary conclusion, that the prisoner was the murderer: that in a case of this kind, the jury should reject all doubtful testimony, and take no fact as proved, about which there was any just ground to doubt.
"First: as to the killing. Did John Davis come to his death by violence or by natural causes? Unfortunately, there was no grounds to doubt the fact of his death: that his death was produced by the hand of violence, the State relies on the testimony of the widow, and of Eliza Davis, the daughter: that the deceased left his house on Sunday evening, the 4th of September last, then in his usual health, about half hour by sum, saying that he was going to his hog-pen, some hundred yards from his mill: that he was searched for that night and not found till next morning: that he was then found in the bed of the creek, dead, with several marks or bruises on the left side of the neck and head, as described by the witnesses — some saying three or four, and one (Harkey) four or five, any three of which, in his opinion, was sufficiently severe to produce death: the opinion of the witness was worth nothing, but it was for the jury to say, whether from the wounds described by the witnesses, they were satisfied such was the result. They had stated these wounds were so severe, that on pressing with the finger on the side of the face, or head, the blood would gush out of the nose and ears. The gentleman who had been examined gave it as his medical opinion that, from the statement of the witnesses as to the character of the *Page 420 
wounds, death would necessarily have followed: whether these several matters were true, was the province of the jury to decide. So the State relied on the other facts, as testified to by the witnesses, that blood was found in several places along the path near the bank of the creek, near to the place where the body was found — that there was hair, corresponding with that of the deceased, and his hat lying some five yards off: that a large club, as if freshly cut, and corresponding with the sapling from which it was supposed to have been cut, was found in the bed of the creek within a few steps of the body: taking these facts as true, and that was for them, could there exist any rational grounds to doubt as to the fact of killing? The prisoner's counsel had argued, that the deceased might have come to his death by falling into the creek and drowning, or by apoplexy; so he might, but it was for the jury to say whether such a death, under the circumstances was reasonable, or even probable.
"As to the manner of killing, it was not incumbent on the State to show that the blow if given, had been inflicted with the stick, as appeared in evidence, but any other thing calculated to inflict wounds of a similar kind, would support the indictment.
"As to the time when the deceased was killed, if killed at all, you have no direct evidence; the testimony of the old lady and daughter is, that he left home a half hour by sun; that he was missing that night, and that he was found in the creek next morning; from the signs of blood near the path, and other discoveries, the jurors, who were on the inquest, and who were examined as witnesses, concluded he might have been killed, and probably was, about, or before sun-down; but on this point there was no direct evidence; it might have been at the time supposed, or during that night, as the witnesses, who made the examination on Sunday evening, say they found no signs until the next morning: the murder, by whomsoever perpetrated, from this evidence must have been done between the half hour by sun, when he was last seen alive, and sun-rise *Page 421 
the next morning, when he was found dead: at what precise time it took place the State was not bound to show.
"If the jury entertained any doubts on either of these points — the killing, or the manner of the death — their inquiry would stop, and they should acquit the prisoner. But if they were satisfied on these points, they would proceed to the important inquiry, so far as the prisoner was concerned, was he the perpetrator of the foul deed? In prosecuting this inquiry as before stated, the jury should reject every doubtful circumstance, and then say whether the facts they considered as proved, established the guilt of the prisoner, and that beyond all doubt?
"First. The State says the prisoner had the opportunity of committing the murder: to establish this, the State relies on the fact as stated by the witnesses, that the prisoner lived within one mile of the place where the deed is supposed to have occurred, and that he was absent from home at the time, as testified to by the old lady, who, as she says, was living in the same house, and, as it is insisted, if the several witnesses are to be believed, was still in the neighborhood.
"Secondly. The State says if the witnesses are to be believed, the prisoner had a motive for doing the act; — a difficulty had occurred between the deceased and the prisoner, in July previous to the alleged murder: the prisoner had been bound over to the Superior Court, and he applied to the witness, Logan Burgin, to be his security, and the witness swears that in the conversation, the prisoner said, if Davis swore that he struck him with a stick he swore to a lie, and added if he fools with him he would fix him so he could not swear again. The witness says he admitted he had struck him with his fist. The two witnesses, Bicknell, were examined as to what they had heard the prisoner say the day after the trial before the magistrate. The first says, he told him Davis had sworn he struck him with a stick, which he denied, and said, that man had better mind or he would put him where he would do no good. The other Bicknell heard prisoner say damned old pup, better not let him get hold of him: would kill him. On his wife reproving, *Page 422 
said he had told deceased so. Vaughn swears he met the old man in the field soon after the offense occurred; that he was bleeding — told him that prisoner had struck him with a stick — told this to prisoner — he denied it, and said if deceased swore it he would kill him. This witness' testimony had been strongly objected to in the argument, because he had sworn falsely in swearing he had not been examined before the committing magistrates, and therefore, was not to be believed. The Court charged that if the witness had knowingly and corruptly sworn falsely, the jury would reject his testimony; but if it was a mistake, and not through corruption, then they would decide as to what credit they would give the testimony; so if they rejected it, they would then consider the other testimony on the points of motive and threats. Then as to the prisoner's absence, and the signs of blood on his clothes. His Counsel argued that he was not bound to show where he was; and the witnesses were mistaken as to the signs of blood; and that he might have got the blood in some other way. It is true, the prisoner was not bound to account for his absence, but if he failed to do so when informed of the charge against him, and that recently after the murder was alleged to have been committed, it would be for the jury to draw their own inference. The witnesses swore, when asked when he left home? when he came over? where he had been? and where he had staid? he answered he left home on Saturday; came over on Monday; and that he had been nowhere, and had staid nowhere. It was for the jury to consider this statement and to draw their own conclusion. As to the signs of blood upon his pantaloons, the witnesses who were along when he was arrested, concur in swearing, that on the blood being discovered they got down and examined the pantaloons and the signs were blood; and one of them, Lyttle, swears he saw the prisoner, on the way, attempting to rub it out.
"These are the several circumstances relied on by the State to connect the prisoner with the crime, and to satisfy the jury that he did the deed — the opportunity — the motive — threats — absence, and signs of blood. *Page 423 
"To this the counsel for the prisoner replied, that the fact of killing might have been placed beyond doubt by a medical examination, and as this was not done, every inference is to be drawn against the omission; that as to the time and manner of killing, that it was next to impossible for the prisoner, alone, to have done the act, and concealed the body, in the short time allowed by the State's witnesses, without the almost certainty of detection: that if he did the act alone, it must have left on the clothes much stronger marks than those alleged to have been found: that the prisoner may have been absent and may be unable to show where he had been, yet the State had not shown his presence in the neighborhood: as to the riding of the horse, his being seen in the morning, was not proved to any degree of certainty: that the threats relied on, if made, was at a time of passion, and too remote to have any weight, and the witnesses may have misunderstood the expressions; that circumstances pointed to the witness Vaughn, with as much force as to the prisoner — his conduct in making the examination, the place he went to search, showed that he either did the act himself or knew who did, and that his manner on his examination, and false statements, were certain marks of guilt not to be mistaken: that the circumstances were too uncertain and inconclusive to justify a verdict of guilty in accordance with the known principles of our criminal law.
"In conclusion, the Court left it to the jury, to inquire first, as to the facts proved; and unless they left their minds free from doubt, it was their duty to acquit. On the contrary, if the facts admitted of no rational doubt, either as to their existence, or as to the identity of the prisoner, then it would be their duty, however painful, to convict.
"The jury having deliberated for twenty-four hours, and being unable to agree, addressed a letter to the Court, in which they say, `the jury wish to re-examine the witnesses Nesbit and Vaughn, particularly as to the search; they would like to examine testimony as to Vaughn's character:' whereupon, the Court ordered the prisoner to the bar, when the witnesses *Page 424 
Nesbit and Vaughn, were re-examined. Nesbit related, in substance, what he had first sworn. Vaughn stated the same, except he said, that when asked if he had been examined as a witness on the trial before the magistrate, he understood the question to refer to the first trial and not to the last; and also that he returned home on Saturday night and slept one hour, when he got up early and went to Mr. Davis'. Burgin, who had been first examined, swore that Vaughn was a man of good character for truth. This examination was conducted by the Court, against the consent of the prisoner.
"The Solicitor moved the Court to instruct the jury, that even if they should believe Vaughn had aided, or assisted the prisoner in the murder, they should convict on this indictment.
"The prisoner's counsel moved the Court also to instruct, that if the jury should doubt whether the deceased was killed by Vaughn or the prisoner, they should acquit.
"The Court charged, that they would consider all the circumstances in evidence, and if they should think one person alone could not have done the act, but the prisoner had a hand in it, it would be their duty to convict on this indictment: but if they should think that it was the act of Vaughn, or any other person, or the act of the prisoner, and they doubted as to who did it, the prisoner was entitled to an acquittal." Defendant excepted to the instruction given the jury in the several particulars mentioned in the opinion of this Court. Verdict of guilty.
Motion in arrest of judgment. Motion overruled. Judgment and appeal.
An attentive examination, aided by able arguments of counsel, and by repeated discussion among ourselves, and stimulated by an anxious desire to come to a just conclusion in a case of such great importance, both to the State and to the prisoner, has not enabled us to discover any error, either *Page 425 
in the bill of exceptions, or upon the record, which entitles the prisoner to a new trial, or to an arrest of the judgment.
The errors assigned by the counsel for the prisoner, in his bill of exceptions, are the following:
"1. That the presiding Judge erred in permitting witnesses to be recalled and re-examined, after the jury had retired to consider of their verdict.
"2. That he erred because he declined telling the jury that they ought to reject, altogether, the testimony of the witness Vaughn.
"3. That he erred in expressing an opinion as to the truth of a material fact.
"4. That in responding to the prayer of the prisoner for a specific instruction, he erred in telling the jury that if they should think one person, alone, could not have killed the deceased, `but the prisoner had a hand in it,' they must convict him.
"5. That in responding to the prayer of the prisoner for a specific instruction, he erred in not giving it in the terms required, but avoided the force of it, by making his charge too vague and indefinite."
1. With respect to the first error assigned, we are saved the trouble of an investigation, because we find that the question which it raises, has been settled against the prisoner by repeated adjudications of this Court. In the case of the State v. Silver, 3 Dev. Rep. 332, it was held that the Court, at the request of the jury, might in its discretion, permit a witness, who had been once examined, to be called again at any time before the verdict was rendered, notwithstanding the witnesses were separated before their first examination, and had since had an opportunity of speaking with each other. Again, in the State v. Rash, 12 Ire. Rep. 382, the Court said that it was a mere discretionary power in the Court below, to permit or refuse, the introduction of additional testimony, after the commencement of the argument of counsel to the jury. So in the State v.Weaver, 13 Ire. 491, it was stated that whether a witness, *Page 426 
who has once been examined, shall be re-examined, is a question of discretion for the presiding judge, and that from his decision no appeal would lie to this Court.
The principle decided in these cases applies to everything which was permitted to be done in the present case. No witness was examined who had not been examined before, and each witness who was recalled, testified to facts which had been previously examined and discussed.
2. The question raised by the second error was ably argued by the counsel, fully considered by the Court, and decided against the prisoner, in the State v. J. T. Williams, at the late term in Raleigh, and not yet reported. (Ante 257.) We have heard nothing in the argument here to change the conclusion to which we came in that case.
3. The third error assigned, is, that the judge expressed to the jury his opinion, that the deceased came to his death "by the hand of violence" and not by his own act. The imputation is, that his Honor, after recapitulating all the facts and circumstances, which had been given in evidence, and relied on by the solicitor to prove that the deceased did not commit suicide, but was killed by another, closed the enumeration thus: "taking these facts as true, and that was for them, (the jury,) could there exist any rational ground to doubt as to the fact of killing?" It is insisted that this question was put in such a manner, as to intimate to the jury that, in his opinion, there could be no doubt as to the killing. "Now it is certain," as the Court said in McRae v. Lilly, 1 Ire. Rep. 118, "that this question might have been proposed in such a tone and manner, as to manifest the clear conviction of the inquirer, how it ought to be answered; but we cannot intend any circumstances of this sort, and without some peculiarity of tone or manner, intimating the opinion of the speaker, and influencing, or tending to influence, the judgment of those addressed, the question submitted very properly directed the attention of the jury to a material inquiry of fact."
These remarks furnish, in our opinion, a complete reply to the argument in favor of the imputed error. We think that *Page 427 
so far from intending, in the question put by his Honor, any peculiarity of tone or manner injurious to the prisoner, we might justly infer the contrary, from the care which he took to caution the jury against relying upon any fact, or circumstance, adverse to the prisoner, unless it were proved by unquestionable testimony. The truth is, that the facts which bore upon the inquiry, then under consideration, could not well be called to the attention of the jury, without impressing the hearers, that the narrator and everybody else could have no other belief than that the deceased was killed by some other hand than his own. But yet, it cannot be doubted that the judge was strictly in the line of his duty, while recapitulating the testimony; and the question which he proposed to the jury was a very proper one, unless accompanied with the objectionable tone and manner, which, as has been shown, we have no right to infer. This subject was before the Court, at its late June term in Raleigh, in the case of the State v.Pinckney Williams, (ante 194) upon an indictment for larceny; and the very strong circumstances of suspicion against the defendant in that case, made a question propounded to the jury by the judge, quite as liable to objection as the one now under consideration; and yet, we held that there was no error. It is proper to remark further, in justification of his Honor's charge, that after calling the attention of the jury to all the facts and circumstances relied upon by the State to show the manner of the killing, he proceeded to state those relied on by the prisoner, together with the arguments of his counsel thereon, to show that the deceased's death was self-inflicted.
4. The instruction prayed by the solicitor, the answer to which gave rise to the fourth exception, was, that if the jury should believe the witness Vaughn "aided and assisted the prisoner in the murder, they should convict on this indictment." His Honor told the jury, in reply to this, "that they would consider all the circumstances in evidence, and if they should think one person alone could not do the act, but that the prisoner had a hand in it, it would be their duty to convict on this indictment." The prisoner's counsel except to this *Page 428 
charge, upon the ground that the expression "had a hand in it," was so indefinite in its meaning, that it was calculated to mislead the jury, and was, therefore, erroneous; that by having a hand in an act was commonly understood to mean the being in any way concerned in, or connected with it, by any person, whether present or absent, near the scene of it or at a distance from it. If this were the sense in which his Honor's language might fairly be understood, then it would be erroneous. But we cannot think that such is the fair construction of it. It was spoken with reference to the testimony given on the trial, and must be taken as having been applied to that testimony. The case does not show that anything was said by any of the witnesses tending to prove that the homicide had been procured to be done by some person not present at the time of the killing; and we cannot see, therefore, how the jury could have been misled by the expression to which the exception is taken. The counsel objected further, that the language was unusual, and never before heard of in a judicial proceeding; but in that they are mistaken, for on the trial of Lord Mohun for murder, before the House of Lords, in 1692, the solicitor-general, in his argument for the Crown, and the Lords, in a question propounded to the judges, use the same expression, in the same sense in which it was employed by his Honor. 4 State Trials, Lord Mohun's case, at pages 537, 545.
The fifth and last error assigned in the bill of exceptions, as the ground of a new trial, is, that his Honor did not give a proper specific instruction, which the prisoner's counsel prayed, but instead thereof, gave an instruction which was calculated to prejudice the prisoner's cause. The instruction prayed, was, "that if the jury should doubt whether the deceased was killed by Vaughn or the prisoner, they should acquit." The instruction given was, that if the jury should "think it was Vaughn, or any other person, or the act of the prisoner, and they doubted as to who did it, the prisoner was entitled to an acquittal." The objection is, that the instruction was in more general terms than was requested, whereby its force *Page 429 
and effect were weakened. The counsel for the prisoner insist that the testimony made out a very strong case of suspicion against Vaughn, and that they had a right to have the issue, whether he or the prisoner committed the homicide, presented singly to the jury; and that his Honor by introducing the supposition that "any other person" may have done it, withdrew the attention of the jury from such issue, and thereby prejudiced the case of the prisoner. We admit the prayer of the prisoner was a proper one, and that the judge would have done right in giving the instruction in the very words desired. We admit further, that if the charge, as given, was not substantially what was required, or was calculated to mislead the jury, it was erroneous. Bynum v. Bynum, 11 Ire. Rep. 632. Shelfer v. Gooding, ante 175.
But notwithstanding the strong reliance which the counsel seem to place upon the validity of this objection, we must confess that we cannot perceive its force. It appears to us, that the instruction given, included in express terms, that which was asked, and then added something which made it more favorable to the prisoner. The jury were told that if they doubted whether it was the prisoner, or Vaughn, or any other person who did the act, they must acquit the prisoner. Vaughn's case was certainly put before the jury, and the residue of the charge was in effect, (and the jury could not have understood it otherwise,) that if they had a reasonable doubt, whether the prisoner committed the murder, he was entitled to an acquittal. That reasonable doubt would necessarily be created by the supposition that Vaughn, or any other person, might have done the act. Unless the counsel wished the jury to be told that if they did not believe that Vaughn was guilty, then they must find the prisoner guilty, even though they suspected that some other person had committed the crime, we cannot see how the prisoner was injured, or could have been injured, by the instruction given.
In the event that a new trial should be refused, the prisoner's counsel moved in arrest of the judgment, assigning therefor two grounds. *Page 430 
1. That in the latter part of the bill of indictment, the word "oath" is omitted.
2. That the bill of indictment is fatally defective, in charging that the death was caused by a "blow" instead of a wound.
The first ground of objection is, in our opinion, untenable. In the commencement of the indictment it is expressly stated, in the usual form, that "the Jurors for the State upon their oaths present" c., and that is sufficient, without repeating that the charge of murder was made upon their oaths. In the case of the State v. Kimbrough, 2 Dev. Rep. 431, it did not appear anywhere upon the record, that the grand jurors had been sworn; yet the Court held, that as the proceedings were in a court of superior jurisdiction, it would be intended that the bill of indictment was duly found upon the oaths of a requisite number of good and lawful men. In the present case, the record states expressly that the grand jurors were "drawn, sworn, and charged, as a grand jury." It follows, of course, that the bill of indictment, and every part of it, was found upon their oaths.
The second objection is one of much more importance and difficulty, and were we required to decide upon it according to the principles of the common law applicable to the subject, we might hold it to be a fatal one. But we are not at liberty to disregard the Act of 1811, (1 Rev. Stat. ch. 35, sec. 12) which declares that "In all criminal prosecutions which may be had by indictment or presentment, it shall be sufficient for all intents and purposes, that the bill shall contain the charge against the criminal, expressed in a plain, intelligible, and explicit manner; and no bill of indictment, or presentment, shall be quashed, or judgment arrested, for, or by reason of any informality or refinement, where there appears to the court sufficient upon the face of the indictment to induce them to proceed to judgment."
The counsel for the prisoner contend that this act, unless confined within narrow limits, will destroy everything like regularity and formality in criminal prosecutions, and thus *Page 431 
withdraw from the accused that protection which the free spirit of the common law secured to them; and that, therefore, it ought to be construed strictly. Indeed, one of the counsel, Mr. Edney, ventured to call in question the wisdom of the Act, and of the General Assembly which passed it. In that, however, he is opposed by the late distinguished CHIEF JUSTICE, who, in the case of the State v. Moses, 2 Dev. Rep. 452, used, in reference to this Act, the following language: "this law was certainly designed to uphold the execution of public justice, by freeing the courts from those fetters of form, technicality and refinement, which do not concern the substance of the charge, and the proof to support it. Many of the sages of the law had called nice objections of this sort, a disease of the law, and a reproach to the bench, and lamented that they were bound down to strict and precise precedents, neither more brief, plain nor perspicuous, than that which they were constrained to reject. In all indictments, and especially those for felonies, exceptions extremely refined, and often going to form only, bad been, though reluctantly, entertained. We think the legislature meant to disallow the whole of them, and only require the substance, viz: a direct averment of those facts andcircumstances which constitute the crime, to be set forth." We think that the wisdom and the beneficent operation of the Act, are by these remarks amply vindicated; and we shall not hesitate to give to it the effect to which the decisions of our predecessors have settled that it is entitled. The Act has not dispensed with the necessity of stating, in the bill of indictment, the substance of the charge, but it has required the courts to disregard what is merely informality or refinement. We must inquire then, what is an informality or a refinement? An informality (says Judge GASTON, in delivering the opinion of the Court in State v. Gallimore, 2 Ire. Rep. 372) is a "deviation in charging the necessary facts and circumstances constituting the offense, from the well approved forms of expression, and a substitution in lieu thereof of other terms, which nevertheless make the charge in as plain, intelligible, and explicit language. Such a deviation is always *Page 432 
dangerous, but, by means of such a substitution, it may be rendered a mere informality, which is cured by the Statute. A refinement is understood to be the verbiage, which is frequently found in indictments, in setting forth what is not essential to the constitution of the offense, and therefore, not required to be proved on the trial." "An informality," (says RUFFIN, C. J., in the case of the State v. Moses, case above referred to,) "can embrace, perhaps, only the mode of stating the fact. If the fact be one essentially entering into a crime, it must be set forth: but it need not be set forth in any particular words, if other words can be found which will convey the whole requisite legal idea. Pleaders are to be much commended for pursuing the ancient, settled and approved precedents. They are the best evidence of the law itself; and it is a becoming modesty in us, the emblem of merit, to evince a marked veneration for the sages who have preceded us. But it has pleased the Legislature not to require, as a matter of duty, in all cases, what is certainly a matter of prudence and propriety." Having thus ascertained the legal meaning of the terms "informality" and "refinement," it remains for us to inquire, whether the substitution of the word "blow" for the word "wound," in the indictment now before us, is such an informality as is cured by the Statute. The counsel for the prisoner contends that it is not — that, on the contrary, it is a defect in the substance of the averment of the means whereby the deceased came to his death, and, therefore fatal: that the word "blow"
signifies the cause only of the wound, which is the effect of the blow, from which effect the death ensues: and that such wound, being the immediate cause of the death, must be stated, instead of the remote cause, which is the blow.
The language of the Court in the case of the State v. Martin, 3 Dev. Rep. 329, to which we have referred particularly in the State v. Tom, (decided at the present term, ante 414,) goes far to support this argument. But it is to be remarked, that the Act of 1811 is not at all alluded to in that case, and the decision seems to have been put upon the strict principles of the common *Page 433 
law. We admit the force of the argument, provided the premises be true, that the word blow in the connection in which it is used does not convey "the whole requisite legal idea" of the means whereby the deceased was killed. The charge is, that the prisoner "with a certain club, which he, the said Alfred W. Noblett, in both his hands then and there had and held, the said John Davis, in and upon the left side of the head, cutting the left ear, and mashing the nose and left check bone of him the said John Davis, then and there feloniously, c., did strike, giving to the said John Davis then and there with the club aforesaid, in and upon the left side of the head, cutting the left ear and mashing the nose and left cheek bone, of him the said John Davis one mortal blow, of which said mortal blow the said John Davis on, c., instantly died." Mr. Walker defines the word "blow," to mean a "stroke," and the verb "to mash" of which mashing is a participle, to mean "to beat into a confused mass." Now it seems to us that a blow or stroke with a club, which has the effect of cutting the left ear and mashing or beating into a confused mass, the nose and left cheek bone of the deceased, shows to the Court, as clearly, the means whereby the deceased was killed, as if the word wound had been used. The case of theState v. Moses, decides that the Act of 1811 dispenses with the necessity of stating the dimensions of a wound, and we think that it is equally effectual to dispense with the necessity of using the word wound, when other terms of equivalent meaning are employed.
The result of our opinion, is, that no error has been shown in the bill of exceptions, or in the record, to prevent the sentence of the law from being passed upon the prisoner; and to the end that such sentence may be pronounced, it must be certified that there is no error in the record.